**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
............................................................................X

IBRAHIM SHEIKH,

                  Plaintiff,

          -against-

SAMEENA FAROOQ, MOHAMMAD
FAROOQ, AND MARYLAND
MANAGEMENT & RESTORATION, LLC,

              Defendants.

............................................................................X

**FILED**
**CLERK**

4:55 pm, Sep 23, 2022

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION & ORDER**

16-CV-3169(GRB)(AYS)

**GARY R. BROWN, United States District Judge**:

Appearances:

Sardar Mohammad Asadullah
Sardar M. Asadullah, PLLC
*Attorneys for Plaintiff*
626 RXR Plaza
West Tower 6th Floor
Uniondale, NY 11566

Paul Rex Golden
Hagan, Coury & Associates
*Attorneys for Defendants Sameena & Mohammad Farooq*
908 Fourth Avenue
Brooklyn, NY 11232

Roderick Barnes
Rollins, Smalkin, Richards & Mackie, LLC
*Attorneys for Defendant Maryland Management & Restoration, LLC*
300 E. Lombard Street
Suite 900
Baltimore, MD 21202

      In his complaint, the plaintiff Ibrahim Sheikh ("Sheikh") purports to assert two causes of

action: first, a declaratory judgment upholding the enforceability of an Indemnification Agreement

between him and the defendants, and second, indemnification against damages, legal fees and costs

in connection with a judgment issued by a Maryland Court.  *See generally* DE 1.  As discussed below, that there is not even a colorable argument that the parties entered the so-called "Potential Indemnity Agreement" renders this claim meritless, if not frivolous.  That, in detailed findings, the Maryland Court determined that plaintiff had, among other things, submitted forged and backdated documents in connection with the underlying business transactions only reinforces that plaintiff cannot prevail on these claims.  *See, e.g.*, DE 60-15 at 10.  The only other pending claims are eight counterclaims by defendants seeking recovery against plaintiff on several theories, all of which are predicated upon plaintiff's fraudulent conduct leading to the Maryland judgment.  DE 5.  However, as the undisputed facts and the state court findings demonstrate, defendants engaged in independent conduct – including refusing to submit to certain audit procedures – which led to material breaches of agreements with non-parties providing an independent cause of liability.  *See, e.g.*, DE 60-15, at 16.

Before the Court is a motion for summary judgment by defendants as to plaintiff's claims for a declaratory judgment and indemnification and as to defendant's counterclaims.  As none of the claims or counterclaims are viable on the undisputed facts, summary judgment is GRANTED in favor of defendants as to all claims and in favor of plaintiff as to all counterclaims, resulting in dismissal of the action.

### BACKGROUND

This dispute arises out of a personal relationship and real estate development project gone awry.  Defendants Mohammad & Sameena Farooq (collectively "the Farooqs") have known plaintiff Ibrahim Sheikh since he was a child and enlisted his help in developing several historic residential properties in Baltimore.  Sameena Aff., DE 59-1 at ¶ 7; Sheikh Aff., DE 61 at ¶¶ 2-4.  This project, known as the Station North Development Project, was a joint venture between various

companies owned by defendant Sameena Farooq and the Barry-Foss Historic Fund 2011 Limited Partnership ("Foss") whereby the Farooq entities would renovate certain properties to originate Historic Tax Credits ("HTCs") from the government and these HTCs would then pass through to Foss. *See Barry-Foss Historic Fund 2011 Ltd. Partnership v. SN Development, LLC*, No. 24-C-14-001109, 2016 WL 1441446 at ¶¶ 1-2 (Md. Cir. Ct. Jan. 20, 2016). A graphic depiction of the transaction, as set forth in the Maryland complaint, helps clarify this sprawling arrangement. DE 60-5, at 17.



Sameena owned the properties to be renovated through her LLC, Yankee Development 2 ("Yankee"), and in April 2010 Station North Development Member LLC was formed with Sameena as its sole member and manager. *Barry-Foss Historic Fund 2011 Ltd. Partnership*, 2016 WL 1441446 at ¶¶ 5, 8. In March 2010, Sheikh and Mohammad formed defendant Maryland

Management and Restoration, LLC ("MMR"), with Mohammad's ownership stake at 99% and Sheikh's at 1%. *Id*. at ¶ 6. The following January, Mohammad's interest in MMR was reduced to 40% while the remaining 60% was allocated to Management Restoration Services, LLC, an entity wholly owned by Sheikh. *Id*. at ¶ 9. SN Development, LLC ("Owner") subsequently assumed Yankee's role and MMR was contracted to perform the construction work for a commission of 15% of the costs incurred in doing so. *Id.* at ¶ 17. Sameena was the sole member of Owner. *Id*. at ¶ 20. In October 2011, SN Development Master Tenant, LLC ("Master Tenant") was formed with Sameena as its sole member. *Id.* at ¶ 22.

In December 2011, Master Tenant and Foss formed a joint venture whereby Foss would own 99.99% of Master Tenant as a passive member in exchange for a capital contribution of $2,081,756 to be payable over seven installments upon receipt of certain deliverables from the managing member ("Member") owned by Sameena. *Id*. at ¶ 29a. These deliverables included "Certificates of Substantial Completion" to be signed by an architect and Certificates of Occupancy issued by the City of Baltimore. *Id*. Under the terms of the agreement with Foss, the project was projected to generate $2,226,700 in HTCs, 99.99% of which would pass through to Foss ($2,226,477). *Id.* at ¶¶ 19a-b, 25. In exchange for the generation and pass through of these tax credits, Foss would pay 93.5 cents per HTC generated in 2011, but that figure would decrease to 89 cents if the HTCs were generated in 2012. *Id*. at ¶ 19b. Sameena's expected return was to be $2,081,756 based on the 93.5 cent purchase price. *Id*. at ¶ 28d. Additionally, Sameena signed a personal guaranty for Member and Master Tenant's obligations under the agreement. *Id*. at ¶ 29c. Foss had the right to cause the Farooq entities—and Sameena individually by virtue of her personal guaranty—to repurchase any capital contributions already made if there was a material default on the part of the Farooq entities. *Id*..

On December 30, 2011, Mohammad informed Foss that the Certificates of Occupancy for the properties would not be issued until 2012 as construction was not yet completed.  *Id*. at ¶ 30. In response, Foss's agent provided Certificates of Substantial Completion back-dated to December 31, 2011, and instructed Sheikh to have an architect sign them, while the Certificates of Occupancy would follow.  *Id.*  Foss then provided the first two capital contributions totaling $624,526.  *Id*. at ¶ 31.  In January 2012, Sheikh provided Certificates of Substantial Completion that were altered and signed by the construction manager instead of an architect as Foss had previously requested. *Id*. at ¶ 33.  Pursuant to their agreement, the purchase price was reduced to 89 cents as the HTCs would now be received in 2012 and not 2011.  *Id*. at ¶ 38.

While the parties were negotiating for a second project, Foss informed Sheikh and the Farooqs that their entities would need to undergo an audited cost certification before the second project could commence.  *Id*. at ¶ 39.  In April 2012, Sheikh provided the final two Certificates of Occupancy, but these were quickly discovered to be forgeries by Foss.  *Id*. at ¶ 40-41.  Shortly thereafter, the Farooqs submitted a request for Foss's third capital contribution, but Foss requested a conference after discovering discrepancies between earlier figures and the new cost certification provided by the Farooqs' accounting firm.  *Id*. at ¶¶ 42, 45, 47, 48.  In May 2012, Foss informed the Farooqs that the third capital contribution would not be released until Owner and Member underwent an audit by Novogradac, an accounting firm familiar with HTC investments.  *Id*. at ¶ 50.  Sameena refused to comply notwithstanding a contractual duty to do so and two weeks later Foss sent a Notice of Material Default because Member had provided forged Certificates of Occupancy, submitted Certificates of Substantial Completion representing that work had been completed when work would continue for several more months, and was unable to provide support for the construction costs despite a requirement to do so.  *Id*. at ¶ 51.  Notwithstanding the

numerous defaults detailed above, Foss offered to abstain from exercising its rights under the agreement if Sameena would comply with an audit of Master Tenant's costs for the project by Novogradac, provide supporting documentation for contractor costs, and agree to a change in the installment structure of capital contributions. *Id*.

A week later, Foss sent an identical notice of default, again offering to forebear on its rights provided that an audit be conducted. *Id*. at ¶ 52. Member, through Sameena, responded by denying the allegations and requesting that McGladrey perform the audit instead. *Id*. ¶ 53. The parties continued to negotiate throughout July 2012 and Sameena ultimately agreed to Novogradac performing the audit provided she could review the engagement letter beforehand and that the audit would be completed by September 30, 2012. *Id*. at ¶ 55. Throughout August and September, employees of Novogradac attempted to obtain information regarding costs and sought to determine whether MMR was a related entity, but Sameena never retained Novogradac notwithstanding her contractual obligations. *Id*. at ¶¶ 59-60, 69. The information she did provide did not assuage Foss's fears that costs had been inflated through the lack of an arms-length relationship between MMR and Member, Owner, and Master Tenant. *Id*. at ¶¶ 57-69.

In November 2013, after more than a year of dilatory efforts by Sameena, Foss sent a third Notice of Material Default restating the allegation of the previous two notices and adding allegations that Member had defaulted by: (1) delivering an incorrect tax certification; (2) violating its fiduciary duty by entering into transactions with related entities; (3) providing forged Certificates of Occupancy; (4) failing to timely deliver a payment certificate; (5) failing to deliver tax returns; and (6) delivering tax returns that were factually inaccurate. *Id*. at ¶ 70. Under the agreement, Foss, as sole owner of Master Tenant, could remove Member as managing member and become the new managing member. *Id*. at 70.

In February 2014, Foss filed suit against SN Development Master Tenant for breach of contract and against Sameena for breach of the personal guaranty agreement she had signed ("Contract Action"). The Circuit Court for Baltimore City ultimately ruled in favor of Foss in the Contract Action and awarded Foss $1,114,987.60 in damages for the breaches by SN Development Master Tenant and $28,141.02 in costs. *Barry-Foss Historic Fund 2011 Ltd. Partnership v. SN Development, LLC*, 2016 WL 1441446 at *13 (Md. Cir. Ct. Jan. 20, 2016). The court also ruled in favor of Foss on the claim for breach of the guaranty agreement, finding Sameena personally liable for the damages assessed to SN Development Master Tenant. *Id*.

In September 2014, Sheikh and the Farooqs began discussing a settlement to resolve open issues between them. *See* Def. Rule 56.1 Statement, DE 59-3 at ¶ 1. Sheikh sought to exit MMR and relinquish his role as managing partner as he believed that the Farooqs' business practices were suspect, including inflating costs in transactions between related entities. *See* Sheikh Dep. Tr., DE 60-2 at 9:23-10:15, 13:7-16:21; Sheikh Aff., DE 61 at ¶¶ 6-8. The parties and their attorneys then attempted to craft a mutually agreeable settlement of all the outstanding matters between them. The contemplated settlement included (1) Sheikh's forfeiture of his interest in MMR to Mohammad, (2) the transfer of at least one property owned by Sheikh to the Farooqs, and (3) an agreement to indemnify each other for potential liabilities relating to the failed Foss project ("Potential Indemnity Agreement").[1] Sheikh Dep. Tr., DE 60-2 at 19:7-20:18. Emails exchanged between Sheikh and the Farooqs' attorney establish that all three individual elements of the transaction were necessary before the overall settlement would become legally operative. *Id*. at 22:17-37:20, 63:11-18. Though a copy of the agreement was provided to Sheikh, it was merely

---

[1] The Potential Indemnity Agreement included a mutual release between the Farooqs (including entities within their ownership) and Sheikh and indemnity for Sheikh for claims asserted against him in his capacity as manager of MMR, provided that "Sheikh acted in good faith and for a purpose that he reasonably believed to be in…the best interests of MM&R and Farooq." Potential Indemnity Agreement, DE 60-3 at §§ 3, 4.

for review and would not be operative until all contemplated transactions were simultaneously completed. *Id*. at 22:20-23:7, 44:25-45:6. The contemplated real estate transfer(s) never occurred, and the Potential Indemnity Agreement was never executed. *Id*. at 55:23-56:19; 130:18-131:8.

In April 2015, Foss filed suit for fraud against Sheikh, the Farooqs, MMR, and Station North Development, LLC ("Tort Action"). *See* Tort Action Compl., DE 60-5. Sheikh ultimately settled the claims asserted against him. *See* Compl., DE 1 at ¶ 15. Sheikh now seeks a Declaratory Judgment that the Potential Indemnity Agreement entitles him to indemnity from the defendants, and indemnification for "legal fees in excess of $180,000" he incurred defending himself in the Foss Tort Action. *Id*. at ¶¶ 20-36. In their answer, the Farooqs assert counter- and cross-claims against Sheikh and MMR for negligence, tortious interference with contract, common law indemnity, and breach of fiduciary duty seeking $1,143,128.60 in indemnification for the damages assessed to Sameena through her personal guaranty in the Foss Contract Action. *See* Answer, DE 5 at ¶¶ 82-108. Additionally, Sameena is seeking to recover over $2,000,000 in damages from MMR and Sheikh due to the loss of her ability to offset her tax liability by virtue of the HTCs that would have been generated by the project. *Id*. at ¶¶ 85-90. Further, the Farooqs seek a declaratory judgment that the Potential Indemnity Agreement is not enforceable. *Id*. at ¶¶ 109-17.

**DISCUSSION**

***Summary Judgment Standard***

This motion for summary judgment is decided under the oft-repeated and well-understood standard for review for these matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd*, 643 F. App'x 54 (2d Cir. 2016), which discussion is incorporated by reference herein. In sum, the question before the Court is whether, based upon

the undisputed or improperly disputed facts, the defendants are entitled to judgment.  It is with this standard in mind that the Court turns to the motions at bar.

### *Enforceability Of Indemnity Agreement*[2]

"To form a binding contract there must be a meeting of the minds . . . such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement *with respect to all material terms*."  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016) (citations and quotation marks omitted) (emphasis added).  "In determining whether the parties intended to enter a contract, and the nature of the contract's material terms, we look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds."  *Id*. at 448-49 (citations and quotation marks omitted).

The emails exchanged by the parties during this period demonstrate that there was not yet an agreement about which properties Sheikh would be required to transfer to effectuate the settlement and obtain the benefit of the Potential Indemnity Agreement.  DE 60-2 at 28:23-29:17; 45:25-47:16.  In Sheikh's view, only the Lattingtown property needed to be transferred, but the Farooqs believed that another property, the North Milton property, was also a part of the transaction.  *Id*. at 20:19-23; 28:4-29:17.  Accordingly, it is apparent that there was never a meeting of the minds as to the scope of the agreement and, thus, the Potential Indemnity Agreement remained exactly that – potential.  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) ("[I]t is rightfully well settled in the common law of contracts in this State that a

---

[2] The Court will apply the law of the forum state, including its conflict of law rules, since it is sitting in diversity.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  "If no conflict exists, then the court should apply the law of the forum state in which the action is being heard." *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (N.Y. App. Div. 2003), *aff'd sub nom. Excess Ins. Co. v. Factory Mut. Ins.*, 822 N.E.2d 768 (2004); *Utica Mut. Ins. Co. v. Abeille Gen. Ins. Co.*, 170 N.Y.S.3d 753, 756 (N.Y. App. Div. 2022) (same).  Neither party has raised an issue as to any conflict of law between New York and Maryland and, upon its own review, the Court finds no conflict.  Thus, New York law will be applied to the question of whether a contract was formed.

mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.").

Additionally, the record establishes that proper execution of the agreement never occurred. *See, e.g.*, DE 60-2 at 19:7-30:16; 56:24-57:10; 63:11-18. The Farooqs' attorney had provided the signed agreement to Sheikh for review prior to execution, but required it countersigned by all parties in New York and Sheikh's emails and deposition testimony demonstrate his awareness of this. *Id.* at 22:20-23:7; 44:25-45:6; 53:10-54:10. In fact, it was *Sheikh* who repeatedly attempted to schedule an in-person meeting whereby the parties could simultaneously execute the Potential Indemnity Agreement *and* complete the real estate transfer(s) to effectuate the full settlement of all open matters between them. *See, e.g.*, *id.* at 25:19-27; 41:12-23; 51:24-52:7; 57:11-15. "[I]f the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed. Certainly, when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent." *Stonehill*, 28 N.Y.3d at 451 (citations and quotation marks omitted). The record establishes that the contract itself was never consummated.

Assuming, arguendo, there had been a meeting of the minds, a condition precedent to the contract's formation was not met. When there is a condition precedent to formation, "no contract arises unless and until the condition occurs." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995); *Luxor Cap. Grp., L.P. v. Seaport Grp. LLC*, 50 N.Y.S.3d 70, 71 (N.Y. App. Div. 2017) (finding no enforceable agreement where "the transaction at issue was . . . contingent upon mutually satisfactory documentation" and "plaintiff[]'s internal communications and actions reflect[ed] an intent not to be bound absent execution of various documents and receipt

of additional information, and the record shows that [plaintiff] never received those documents and information.") (internal quotation marks omitted).   The record here establishes that the enforceability the Potential Indemnity Agreement was conditioned on Sheikh's transfer of deeds to at least one additional property to the Farooqs and a settlement of Sheikh's negative capital account with MMR in lieu of monetary consideration for the real estate transfer(s).   *See* 9/8/14 email chain, DE 60-1 at 2-3; DE 60-2 at 30:4-32:15.   Sheikh's deposition responses and the emails exchanged by the parties indicate that the real estate closings were part and parcel of the agreement to globally settle all outstanding issues between the parties, including the potential indemnity agreement and forfeiture of interest in MMR.   *See id.* at 60-2 at 26:2-30:16; 36:12-37:10; 38:3-21; 40:2-14; 45:25-46:10; 51:24-56:12.   The following testimony proves particularly illuminating:

> Q: You just mention [sic] Mr. Farooq had mentioned something about the Lattingtown matter, there would have to be a closing with the Lattingtown property, correct?
> A: He was looking to close it before we had an agreement.
> Q: So, you understood that he wanted the Lattingtown matter resolved through a closing with you before this agreement, [the Potential Indemnity Agreement] would be considered completed; is that correct?
> A: Yes.
> Q: And did he or anyone else ever say to you anything along the lines of hey, listen, we changed our mind, all we need to do is [the Potential Indemnity Agreement], this can be handled on its own and you don't have to handle anything else with any closing, did anyone ever say anything like that to you?
> A: No.

*Id*. at 36:15-37:10.   And, further:

> Q: So you got, in essence you felt you got what you wanted with the agreement signed at [the Potential Indemnity Agreement] and then you understood that in exchange for this [indemnity agreement], you also needed to sign off on some documents concerning Lattingtown, correct?
> A: Correct and I never objected to signing them.

11

*Id*. at 63:11-18.  Those transfers, which were to be completed in conjunction with the execution of the Potential Indemnity Agreement, never occurred.  Therefore, the contract never became legally operative.

Defendants' motion for summary judgment is, therefore, GRANTED as to Sheikh's First and Second Causes of Action and the complaint is dismissed with prejudice.

### *Defendants' Cross-Claims and Counterclaims* [3]

Defendants also seek summary judgment in their favor against plaintiff as to their counterclaims.  Not only is such an order unwarranted, but based upon the undisputed facts and the findings of fact by the Maryland court, the counterclaims are not legally viable and are therefore subject to dismissal.[4]

---

[3] Though Defendants' cross-claims seek relief against MMR, a citizen of New York, dismissal for want of jurisdiction is not required notwithstanding the lack of diversity between defendant/third-party plaintiff Farooq and defendant/third-party defendant MMR.  *See* 28 U.S.C. § 1367(b); *Musso v. City of New York*, No. 05-CV-2511 (RRM)(JO), 2010 WL 11530907, at *4 n. 7 (E.D.N.Y. Mar. 30, 2010) ("Because there is no diversity of citizenship between the parties on this cross-claim, and because the issues rest on state law, supplemental jurisdiction must govern this Court's authority to address the instant motion."); *Wood v. M&J Recovery LLC*, No. CV 05-5564, 2007 WL 1026372, at *3 (E.D.N.Y. Apr. 2, 2007) ("Upon consideration of the issues raised in the cross claims and their relation to diversity claim between the Nevada Shekinah Defendants and the New York Portfolio Defendants, the court holds that the exercise of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 over those claims is appropriate."); *Hammond v. Toy Indus. Ass'n, Inc.*, 8 F. Supp. 3d 484, 488 (S.D.N.Y. 2014) ("This Court has subject matter jurisdiction based on complete diversity of citizenship between the plaintiffs and the defendants and the requisite jurisdictional amount. . . .  With respect to the cross-claims and third-party claims among Bell, Fiesta, Freeman, and TIA, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) wherever diversity jurisdiction does not exist."); *Burrell-Hamilton v. Oden*, No. 17 Civ. 2634 (PGG)(JLC), 2020 WL 1271366, at *2 (S.D.N.Y. Mar. 16, 2020) ("Federal courts have supplemental jurisdiction over cross-claims between non-diverse co-parties under 28 U.S.C. § 1367(a).").

[4] Where, as here, a non-moving party fails to file a cross-motion, summary judgment may only be granted in favor of the non-movant after movant is afforded "notice and reasonable time to respond."  Rule 56(f).  Here, however, the Court may dispense with further delay of this overly-litigated matter because plaintiff fully briefed the relevant issues in its response, defendants had time and the opportunity to address these issues, and defendants fully availed themselves of this opportunity.  *See* Def. Reply, DE 62; *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000) ("[W]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.").  Further, this *sua sponte* determination is rendered more appropriate by the fact that the judgment is "based on issues identical to those raised by the moving party."  *Bridgeway Corp.*, 201 F.3d at 140 (internal citation and quotation marks omitted).

"To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315 (1980).  Sheikh's actions in sending the forged certificates were repeatedly cited in the first two Notices of Material Default sent by Foss and are, therefore, a substantial cause of the breach by Sameena.  It was Sameena's actions in failing to submit to the audit, however, that led to the issuance of the third Notice of Material Default and the commencement of the Contract Action by Foss.  *Barry-Foss Historic Fund 2011 Ltd. Partnership*, 2016 WL 1441446 at ¶ 70.  Thus, her own actions were a substantial factor in producing her injuries as well.  A direct causal link between Sheikh's conduct and Sameena's damages cannot be established as a matter of law given Sameena's repeated opportunities to cure the defaults by complying with the audit and her failure to do so.  This failure to comply ultimately led to the issuance of the Third Notice of Material Default and Foss's termination of the joint venture.

In light of these facts – contained in detailed findings by the state court and largely undisputed[5] – defendants cannot prevail on their counterclaims.  Therefore, summary judgment shall be entered in favor of plaintiff on the counterclaims.

**CONCLUSION**

For all of the foregoing reasons:

1)  Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's First and Second causes of action.

---

[5] There is a nominal dispute in that defendants conclusorily claim they were unaware of plaintiff's false and fraudulent acts, while plaintiff asserts that defendants were aware of his actions.  *See* Pl. Aff., DE 61 at ¶ 10; Sameena Aff. DE 59-1 at ¶ 19.  Defendants' repeated refusal to cooperate in the proposed audit processes, which would have cured the breaches, gives rise to an almost irrefutable inference that defendants knew something was amiss.  This dispute, however, proves immaterial, as defendants' breaches, whether intended to conceal the fraudulent acts or entirely independent of such misdeeds, breaks the causal link and defeats all of the counterclaims.

2)   Summary judgment on Defendants' Counter/Cross-claims is **GRANTED** in favor of

plaintiff.

The Clerk shall enter judgment as set forth above and close the case.

Dated: Central Islip, New York
September 23, 2022

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge